LARRY L. SHARP, ADMINISTRATOR (ESTATE OF DAVID C. SHARP), ET AL. *v.* WYATT, INC., ET AL.
(11315)

FOTI, LANDAU and SCHALLER, Js.

Argued March 31—decision released July 6, 1993

*Joan C. Harrington,* with whom was *Michael P. Koskoff,* for the appellants (plaintiffs).

*Richard A. Jontos,* with whom was *Jane E. Hugo,* for the appellee (named defendant).

*Ben A. Solnit,* with whom, on the brief, were *Robert W. Allen, Thomas R. Gerarde, J. Kevin Golger, Kevin M. Tepas, Sergio C. Deganis* and *James G. Geanuracos,* for the appellees (defendant Exxon Company, U.S.A., et al.).

SCHALLER, J. The plaintiffs[1] appeal from the judgment of the trial court rendered after that court granted the defendants' motion for summary judgment. The issues in this appeal implicate the scope of liability under the warnings provision of Connecticut's product liability statute. General Statutes § 52-572q.[2] Specifically, the plaintiffs claim that the trial court improperly (1) applied the principles governing summary judgment, (2) determined that under Connecticut law no warnings are required unless the product itself is defective,[3] (3) found that any lack of warnings

[1] The plaintiffs are the administrators of the estates of David C. Sharp, Robert Vidal and Alois Entress.

[2] General Statutes § 52-572q provides: "(a) A product seller may be subject to liability for harm caused to a claimant who proves by a fair preponderance of the evidence that the product was defective in that adequate warnings or instructions were not provided.

"(b) In determining whether instructions or warnings were required and, if required, whether they were adequate, the trier of fact may consider: (1) The likelihood that the product would cause the harm suffered by the claimant; (2) the ability of the product seller to anticipate at the time of manufacture that the expected product user would be aware of the product risk, and the nature of the potential harm; and (3) the technological feasibility and cost of warnings and instructions.

"(c) In claims based on this section, the claimant shall prove by a fair preponderance of the evidence that if adequate warnings or instructions had been provided, the claimant would not have suffered the harm.

"(d) A product seller may not be considered to have provided adequate warnings or instructions unless they were devised to communicate with the person best able to take or recommend precautions against the potential harm."

[3] This claim subsumes the plaintiffs' related claim that the trial court improperly granted summary judgment on the ground that a defect in the fuel oils, apart from the lack of warnings, did not cause the deaths.

was not the legal cause of the deaths given the absence of (a) cause in fact, (b) proximate cause[4] and (c) product identification, and (4) rejected expert testimony on the issue of causation. The judgment is reversed and the case is remanded for further proceedings.

The following facts are not in dispute. The defendant Wyatt, Inc. (Wyatt), is a wholesale distributor of petroleum products. Prior to the events at issue, Wyatt purchased petroleum products from the defendants, B. P. North America Trading, Inc.; Exxon Company, U.S.A.; Moore McCormack Petroleum, Inc.; Mount Airy Trading Company; Northville Caribbean Corporation; and Phibro Distributors, Inc. (oil suppliers). Wyatt then sold these products to the Norbert E. Mitchell Company (Mitchell Fuel) for retail sale.

Mitchell Fuel stored the defendants' petroleum products on its premises in seven underground tanks of which five contained number two oil, one diesel fuel, and the other kerosene. The tanks surrounded a vault that housed valves but did not, by design, store petroleum products. Employees of Mitchell Fuel frequently entered the vault via a ladder through a thirty-six inch manhole, but they never first tested oxygen levels in the tank or used protective gear.

On February 3, 1983, Norbert E. Mitchell, Jr., directed his employee, David C. Sharp, to enter the vault and to shut off a valve. Prior to that time, nearly six months had elapsed since anyone had entered the vault. When Mitchell heard banging noises, he instructed another employee of Mitchell Fuel, Robert Vidal, to aid Sharp, but Vidal collapsed at the bottom of the ladder. Mitchell left the area to call for help.

---

[4] The plaintiffs raise two challenges to the court's finding of lack of proximate cause, namely improper application of the doctrines of foreseeability and superseding cause.

Before Mitchell returned, Alois Entress descended the ladder with a rope. He, too, collapsed at the bottom of the ladder. As a result of this incident, the three employees who descended into the vault each died from asphyxiation.

On January 24, 1985, the plaintiffs brought this action against Wyatt pursuant to General Statutes §§ 52-572m through 52-572r.[5] They claimed that Wyatt, as a wholesaler, failed to warn of the hazards associated with the storage of petroleum products. On January 28, 1985, Wyatt impleaded its oil suppliers as third party defendants. Subsequently, the plaintiffs brought direct actions against the oil suppliers.

In 1991, the defendants filed motions for summary judgment. In support of these motions, the defendants asserted that, as a matter of law, their products were neither defective nor the proximate cause of the deaths. They also posited that the plaintiffs' action was barred by the sophisticated user and the bulk supplier defenses[6] as well as by the statute of limitations.[7] In response to the defendants' motions, the plaintiffs argued that the defendants' failure to give adequate warnings of the dangers associated with the storage of petroleum products caused the deaths of the decedents. They also disputed the applicability of the asserted defenses.

---

[5] The plaintiffs also brought suit against their employer, the Norbert E. Mitchell Company. This matter was resolved by our Supreme Court in *Sharp* v. *Mitchell*, 209 Conn. 59, 546 A.2d 846 (1988).

[6] The defendant oil suppliers asserted the sophisticated purchaser and bulk supplier doctrines against the defendant Wyatt, Inc., while Wyatt, Inc., asserted the defense against the plaintiffs.

[7] With respect to the statute of limitations, the defendant oil suppliers raised this defense against the defendant Wyatt, Inc., and the plaintiffs. Wyatt, Inc., did not assert the statute of limitations as a defense to the plaintiffs' suit.

In opposition to the motions for summary judgment, the plaintiffs submitted evidence that supports the following facts. In 1966, Mitchell Fuel purchased seven used tanks and installed them as part of an underground storage facility. Each of the seven fuel tanks leaked petroleum products supplied, in part, by the defendants.[8] Two of the seven tanks contained the defendants' products exclusively. The five number two oil tanks contained roughly 5 percent of products supplied by the defendants. In each of the tanks, the defendants' products commingled with the petroleum products of other suppliers. These other suppliers were not parties in this action. The petroleum products leaked into the vault in an amount proportionate to the percentages of oil attributable to each supplier. The defendants, therefore, supplied approximately 25 percent of the petroleum that leaked into the vault.

As a result of the leakage of petroleum products into the vault, a chemical reaction ensued. In this regard, the plaintiffs have submitted expert deposition testimony to develop two distinct scientific theories. The first theory, styled hydrocarbon displacement, is that hydrocarbon vapors emanating from the fuel products displaced oxygen in the vault. The second theory, entitled biological oxidation, is that microorganisms, indigenous to the soil, consumed petroleum products. In consuming the petroleum products, the organisms utilized oxygen to generate carbon dioxide and water. Under both theories, the chemical reactions operated to deplete oxygen levels in the vault and thereby to cause the asphyxiation of the decedents.

---

[8] At his deposition, George Hoag, an environmental engineer, was asked, "Are you also presuming for purposes of coming to the opinion that you have given in your deposition that the tanks were leaking, the seven tanks that fronted on the vault?" Hoag responded, "I don't believe I've said specifically that the tanks were leaking. I think that with a reasonable degree of scientific probability they were leaking."

The plaintiffs further submitted evidence indicating that the defendants' petroleum products were defective in that they were not accompanied by adequate warnings. Specifically, the defendants failed to warn of the dangers of deoxygenation associated with the storage of petroleum products in confined spaces. The defendants also failed to issue adequate preventative instructions. Because Mitchell did not understand that the petroleum products chemically would deplete the oxygen levels in the vault, he did not take any precautionary measures. For example, had Mitchell been aware of the need to test for safe oxygen levels, he would have done so before directing Sharp to enter the facility.

The plaintiffs' evidence notwithstanding, the trial court granted the defendants' motions for summary judgment and issued a detailed memorandum of decision. With respect to the plaintiffs' scientific theories, the court expressly rejected hydrocarbon displacement as a possible cause of the decedents' deaths. The court found that the theory had been discredited by the plaintiffs' other expert witness, who propounded the second theory, biological oxidation. The court did not flatly reject the second theory, however, instead noting that it, too, was "speculative."

The trial court further determined that the defendants' products were not defective because, unlike the situation where fumes emanate from petroleum products, the process of biological oxidation is not a danger attributable to the petroleum products. The court stated, "the fact that oil is subject to bacterial oxidation is not a defect or fault with the product. . . . Accordingly, it is unnecessary to consider the factual considerations required by the statute to determine whether instructions or warnings were required, whether they were given here, whether they were given

to the proper person to prevent the potential harm, and whether, if adequate warnings were given, they would have prevented the injury."

The principal focus of the trial court's memorandum of decision was on the issue of causation. The trial court found that (1) the defendants reasonably could not have foreseen that the decedents would die in the vault by asphyxiation, (2) the lack of warnings was not a substantial factor leading to the deaths, (3) the acts and omissions of Mitchell Fuel implicated the doctrine of superseding cause, (4) any warnings that the defendants might have provided would not have prevented the accident, and (5) the defendants were responsible for only 5 percent of the oil that may have leaked into the vault and, thus, "the plaintiffs must resort to speculation and conjecture that [the defendants' oil] resulted in the deoxidization of the vault and that a party that caused the decedents' death is in this case."

Lastly, the trial court addressed the statute of limitations defense asserted by the defendant oil suppliers.[9] The issue was whether a two year statute of limitations provision, General Statutes § 52-577c (b),[10] or a three year provision, General Statutes § 52-577a,[11] applied in this case. The court determined that this question

---

[9] The court declined to address the sophisticated user and bulk supplier defenses.

[10] General Statutes § 52-577c (b) provides: "Notwithstanding the provisions of sections 52-577 and 52-577a, no action to recover damages for personal injury or property damage caused by exposure to a hazardous chemical substance or mixture or hazardous pollutant released into the environment shall be brought but within two years from the date when the injury or damage complained of is discovered or in the exercise of reasonable care should have been discovered."

[11] General Statutes § 52-577a (a) provides: "No product liability claim as defined in section 52-572m shall be brought but within three years from the date when the injury, death or property damage is first sustained or discovered or in the exercise of reasonable care should have been discovered . . . ."

involved mixed issues of fact and law and that its resolution was premature at that time. The court, therefore, rejected this defense as an additional basis on which summary judgment could be granted for the defendant oil suppliers.

The plaintiffs appealed from the summary judgment rendered by the trial court. In response, the defendants argue that the judgment was entirely appropriate and also supportable on other grounds.

## I
### STANDARD OF REVIEW

We note initially that the granting of summary judgment by the trial court must meet well established standards. Practice Book § 384 provides that "[t]he judgment sought shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." "Although the party seeking summary judgment has the burden of showing the nonexistence of any material fact . . . it [is nevertheless] incumbent upon the party opposing summary judgment to establish a factual predicate from which it can be determined, as a matter of law, that a genuine issue of material fact exists." (Internal quotation marks omitted.) *Wadia Enterprises, Inc.* v. *Hirschfeld,* 224 Conn. 240, 247, 618 A.2d 506 (1992); *Connell* v. *Colwell,* 214 Conn. 242, 251, 571 A.2d 116 (1990). The mere presence of an adverse claim, however, will not in itself defeat the motion. *Wadia Enterprises, Inc.* v. *Hirschfeld,* supra; *Farrell* v. *Farrell,* 182 Conn. 34, 39, 438 A.2d 415 (1980).

## II
### DEFECTIVE PRODUCTS UNDER GENERAL STATUTES § 52-572q

The plaintiffs claim that the trial court improperly determined that no warnings are required unless the product itself is defective. We agree.

Under Connecticut's product liability statute, General Statutes § 52-572m et seq., the plaintiffs must plead and prove that the defendants' petroleum products were defective and that the defect proximately caused the decedents' death. *Zichichi* v. *Middlesex Memorial Hospital,* 204 Conn. 399, 403, 528 A.2d 805 (1987); *Wierzbicki* v. *W. W. Grainger, Inc.,* 20 Conn. App. 332, 334, 566 A.2d 1369 (1989). A product is defective when it is unreasonably dangerous to the consumer or user. *Coe-Park Donuts, Inc.* v. *Robertshaw Controls Co.,* 1 Conn. App. 84, 86, 468 A.2d 292 (1983).

The established rule in this jurisdiction is that "[a] product may be defective because a manufacturer or seller failed to warn of the product's unreasonably dangerous propensities. *Tomer* v. *American Home Products Corporation,* 170 Conn. 681, 689, 368 A.2d 35 (1976); see also General Statutes § 52-572q; *Giglio* v. *Connecticut Light & Power Co.,* 180 Conn. 230, 235, 429 A.2d 486 (1980); 2 Restatement (Second), Torts § 402A. Under such circumstances, the failure to warn, *by itself,* constitutes a defect. See *Giglio* v. *Connecticut Light & Power Co.,* supra, 236; Prosser, Torts (4th Ed.) § 99, p. 659." (Emphasis added; internal quotation marks omitted.) *Ames* v. *Sears, Roebuck & Co.,* 8 Conn. App. 642, 645, 514 A.2d 353, cert. denied, 201 Conn. 809, 515 A.2d 378 (1986).

In this case, the plaintiffs have alleged in their complaint that the defendants' petroleum products were defective in that they were not accompanied by adequate warnings. General Statutes § 52-572q specifically governs a cause of action of this kind. This statute provides that "a product seller may be subject to liability for harm caused to a claimant who proves by a fair preponderance that the product was defective in that adequate warnings or instructions were not provided." By the express terms of the statute, therefore, the crit-

ical issue of defectiveness focuses on whether warnings were necessary and, if so, whether they were adequate.

Whether a product is defective under § 52-572q is a question of fact. Subsection (b) of that statute clearly states that "[i]n determining whether instructions or warnings were required and, if required, whether they were adequate, *the trier of fact* may consider: (1) The likelihood that the product would cause the harm suffered by the claimant; (2) the ability of the product seller to anticipate at the time of manufacture that the expected product user would be aware of the product risk, and the nature of the potential harm; and (3) the technological feasibility and cost of warnings and instructions." (Emphasis added.)

Here, the trial court misapplied § 52-572q, thereby withholding a threshold issue of fact from the jury, namely, whether the product was defective. The court stated, "the fact that oil is subject to bacterial oxidation is not a defect or fault with the product." On this basis, the court determined that there was no need for the trier of fact to decide whether lack of warnings rendered the product defective under the fact-specific balancing test of General Statutes § 52-572q (b).

The plaintiffs correctly point out that the trial court's analysis reflects a misreading of § 52-572q. The balancing test of subsection (b) is designed to yield an answer to the question of whether the product is defective. By contrast, the trial court first required a showing that the product itself was defective before addressing the question of whether it was defective because the defendants failed to provide adequate warnings. We conclude that the trial court improperly applied § 52-572q in granting summary judgment for the defendants. See *Ames* v. *Sears, Roebuck & Co.,* supra.

## III

### CAUSATION

In its memorandum of decision, the trial court addressed numerous issues regarding the causal link between the allegedly defective products and the decedents' deaths. For several reasons, the court concluded that the plaintiffs did not set forth sufficient evidence to establish the existence of genuine issues of material fact.

Before addressing the court's causation analysis, we note that § 52-572q (c) governs the issue of causation in warnings cases. Section 52-572q (c) provides that "[in warnings cases] based on this section, the claimant shall prove by a fair preponderance of the evidence that if adequate warnings or instructions had been provided, the claimant would not have suffered the harm." Questions regarding the existence of a causal link classically are reserved for determination by the trier of fact. *Hughes* v. *National Car Rental Systems, Inc.*, 22 Conn. App. 586, 590, 577 A.2d 1132, cert. denied, 216 Conn. 817, 580 A.2d 57 (1990). Proximate cause "becomes a question of law only when the mind of a fair and reasonable person could reach only one conclusion . . . . The question should be submitted to the trier of fact if there is room for a reasonable disagreement." (Internal quotation marks omitted.) *Hall* v. *Winfrey*, 27 Conn. App. 154, 158, 604 A.2d 1334, cert. denied, 222 Conn. 903, 606 A.2d 1327 (1992).

### A

#### CAUSE IN FACT

The plaintiffs posit that the trial court improperly premised summary judgment on the lack of a cause in fact. Specifically, the plaintiffs challenge the court's finding that "[t]here is no reason to assume that any

warnings given to Mitchell (which Wyatt claimed occurred)[12] would have prevented the bizarre death of the decedents.''

Pursuant to § 52-572q (c), cause in fact exists if the claimant establishes that the issuance of adequate warnings would have prevented the injury or death at issue. A review of the evidence submitted by the plaintiffs in opposition to the motions for summary judgment indicates that, as a matter of law, cause in fact is a genuine issue of material fact. See *Miranti* v. *Brookside Shopping Center, Inc.*, 159 Conn. 24, 30, 266 A.2d 370 (1969).

In his deposition, Mitchell testified that he did not understand the possibility of an oxygen deficiency in the vault, and, further, that no one had ever told him that the storage facility was dangerous to his employees. Consequently, he did not undertake any precautionary measures, such as sampling the atmosphere in the vault prior to entry. Mitchell testified, moreover, that had he known that oxygen deficiency was a danger, he would have taken the necessary precautions.

The plaintiffs' evidence further indicated that had Mitchell Fuel implemented measures to guard against the deoxygenation of the vault, the decedents would not have died. Testimony indicated that the defendants' petroleum products had leaked from the tanks into the vault, and that this leakage resulted in the deoxygenation of the vault. Thus, the cumulative effect of the plaintiffs' evidence is that if the defendants had adequately warned of the danger of deoxygenation and offered adequate instructions on how to guard against this hazard, Mitchell would have heeded the warnings and taken steps that would have prevented the decedents' deaths.

---

[12] See part IV C, infra, for a discussion of whether the defendants discharged their alleged duty to warn.

Despite this testimony, the trial court determined that, as a matter of law, warnings to Mitchell would not have prevented the decedents' deaths. For the court to have reached this conclusion, it must have discredited the deposition testimony of Mitchell as well as that of the plaintiffs' experts. Issues of credibility, however, are exclusively within the province of the trier of fact; *Berry* v. *Loiseau,* 223 Conn. 786, 821, 614 A.2d 414 (1992); *Caciopoli* v. *Acampora,* 30 Conn. App. 327, 333, 620 A.2d 191 (1993); and should not be resolved for purposes of summary judgment. *Town Bank & Trust Co.* v. *Benson,* 176 Conn. 304, 309, 407 A.2d 971 (1978). "In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party." *Strada* v. *Connecticut Newspapers, Inc.,* 193 Conn. 313, 317, 477 A.2d 1005 (1984). Thus, whether the lack of adequate warnings was the cause in fact of the decedents' deaths remains a disputed issue of material fact. We conclude that summary judgment on this basis was not warranted.

## B

### PROXIMATE CAUSE

The plaintiffs also challenge the trial court's determination that the defendants' failure to provide adequate warnings did not proximately cause the deaths of the decedents. Their position is predicated on the assertions that (1) foreseeability is not the appropriate test for proximate cause under § 52-572q, (2) even under the foreseeability test, factual issues exist under this analysis, and (3) the doctrine of superseding cause is not dispositive of the motions for summary judgment.

In a negligence action, the issue of foreseeability is a crucial component in the proximate cause analysis. "The test for finding proximate cause 'is whether the harm which occurred was of the same general nature as the foreseeable risk created by the defendant's negli-

gence.' " *Coburn* v. *Lenox Homes, Inc.,* 186 Conn. 370, 384, 441 A.2d 620 (1982); *Hall* v. *Winfrey,* supra, 158. Relying on negligence cases, the trial court determined that the trier of fact could arrive at only one conclusion with respect to proximate cause, namely, that the defendants could not "reasonably foresee the possibility of death to the employees of a retail supplier of oil products in an underground vault not known to the defendants and which was not supposed and not likely to contain oil products by them." This conclusion, however, assumes that § 52-572q is ambiguous with respect to the element of causation, and that negligence principles control this step in the analysis. We disagree with the trial court's premises in this regard.

In contrast to the law of negligence, the causation provision of § 52-572q is devoid of any express reference to foreseeability. Moreover, the thrust of subsection (c) is that causation exists upon a showing that, had adequate warnings been provided, the harm would not have occurred.[13] By its express language, therefore, § 52-572q (c) has circumscribed the requirements for establishing causation. Absent any ambiguity in this provision, we need not look beyond its express terms. *Farmers & Mechanics Savings Bank* v. *Garofalo,* 219

---

[13] Causation within the meaning of General Statutes § 52-572q (c) closely parallels the law of warnings in other jurisdictions. See *Schutte* v. *Celotex Corporation,* 196 Mich. App. 135, 140, 492 N.W.2d 773 (1992) (proximate cause in failure to warn case requires showing that "an adequate warning would have prevented the plaintiff's injury by altering the conduct involved"); *Ayers* v. *Johnson & Johnson Co.,* 59 Wash. App. 287, 291, 797 P.2d 527 (1990), aff'd, 112 Wash. 2d 747, 818 P.2d 1337 (1991) ("[plaintiffs'] burden on causation was to prove that, had they been adequately warned of the risks, they would have treated the product differently and avoided the harm"); *Felix* v. *Hoffman-LaRoche, Inc.,* 513 So. 2d 1319, 1321 (Fla. App. 1987), aff'd, 540 So. 2d 102 (Fla. 1988) (same); 1 M. Madden, Products Liability (2d Ed. 1988) § 10.7 (same); see also *Raney* v. *Owens-Illinois, Inc.,* 897 F.2d 94, 96 (2d Cir. 1990) (causation in warnings cases requires that warnings would have been heeded by claimant).

Conn. 810, 814–15, 595 A.2d 341 (1991); *Black* v. *London & Egazarian Associates, Inc.*, 30 Conn. App. 295, 300, 620 A.2d 176, cert. denied, 225 Conn. 916, 623 A.2d 1024 (1993). Accordingly, we conclude that the trial court improperly drew on the law of negligence when it imported the doctrine of foreseeability to the causation analysis under § 52-572q (c).

To be sure, § 52-572q (b) calls on the trier of fact to consider "the likelihood that the product would cause the harm suffered by the plaintiff." That factor, however, does not enter into the causation analysis of subsection (c). Instead, as is true with each of the three factors in 52-572q (b), this factor enters into the analysis of whether the product is *defective* because the product seller failed to provide adequate warnings. Accordingly, we conclude that the trial court's discussion of foreseeability fell outside of the scope of subsection (c) and is therefore not dispositive of the proximate cause issue.[14]

Our analysis of the element of causation does not end here, however, because the trial court additionally determined that, as a matter of law, the conduct of Mitchell was a superseding cause. Relying on the common law of negligence, the court held that "even if the defendants sold defective fuel without proper warnings, that would be such a remote factor in the decedents' death when compared with the conduct of Mitchell Fuel, that the doctrine of superseding cause would undoubtedly relieve the defendants from any liability."

Initially, we must consider the role of the doctrine of superseding cause in the context of a warnings case within the aegis of § 52-572q. Again, our first referent is subsection (c). For superseding cause to operate

---

[14] Our conclusion that foreseeability is inapplicable under General Statutes § 52-572q (c) forecloses any further inquiry as to whether the trial court properly applied the doctrine to the facts of this case.

within the contours of subsection (c), the conduct of Mitchell would have to be such that, despite the defendants' issuance of adequate warnings, he nevertheless disregarded them and, instead, directed Sharp to enter the vault without first taking any of the necessary precautions.

In the present case, the plaintiffs have provided evidence indicating that, had the defendants provided warnings and suggested precautionary measures, Mitchell would have heeded them. Accordingly, we are satisfied that the plaintiffs have established a factual predicate from which we can determine, as a matter of law, that a genuine issue of material fact exists concerning whether the acts or omissions of Mitchell constituted a superseding cause.

## C

### PRODUCT IDENTIFICATION

A related causation issue involves product identification. In rendering summary judgment for the defendants, the trial court determined that, as a matter of law, the plaintiffs failed to show with reasonable probability that the defendants' oil products were in the vault and that they caused the vault's deoxygenation. The court's decision is predicated on the assumption that the petroleum products from the various suppliers did not commingle inside Mitchell's storage tanks.[15] According to the court, the plaintiffs' inability to establish product identification resulted from their failure to join as defendants all of Mitchell's oil suppliers.

Relying on evidence submitted in opposition to the defendants' motions for summary judgment, the plaintiffs take issue with this aspect of the court's determi-

---

[15] For example, in its memorandum of decision, the trial court stated as follows: "The position of the oil of the respective suppliers within the tanks has not been and probably cannot be shown."

nation. The plaintiffs' evidence supports the following facts. Wyatt supplied 25 percent of the oil stored in the seven tanks, 5 percent of the number two oil and 100 percent of the diesel and kerosene products. Inside each of the five number two oil tanks, the defendants' petroleum products commingled with those supplied by the other companies.

Mitchell Fuel had used the tanks since 1966 and, before the accident, the tanks had leaked their respective petroleum products into the vault in proportion to an amount attributable to each of Mitchell Fuel's suppliers. Thus, the defendants supplied 25 percent of the petroleum products that ultimately accumulated on the floor of the vault. On the basis of this evidence, we agree with the plaintiffs that the court prematurely concluded, as a matter of law, that the plaintiffs had not offered sufficient evidence to establish that the *defendants'* petroleum products leaked into the vault.

The more vexing matter is the absence of Mitchell Fuel's other oil suppliers as parties in this action. Nevertheless, this shortcoming is not, at this point, fatal to the plaintiffs' action. In *Champagne v. Raybestos-Manhattan, Inc.,* 212 Conn. 509, 562 A.2d 1100 (1989), our Supreme Court by implication resolved a similar issue. There, the plaintiff brought a product liability action against the defendant for the wrongful death of her husband. The decedent died from prolonged exposure to asbestos in the course of his employment with General Dynamics Corporation, Electric Boat Division (Electric Boat). Id., 514–15. Over a period of sixteen years, the defendant supplied a total of $130,000 worth of asbestos-concentrated insulation to Electric Boat. Id., 512. By contrast, two other asbestos manufacturers *annually* supplied Electric Boat with $350,000 and $250,000 worth of asbestos based products respectively. Id., 512–13.

The defendant in *Champagne* argued that the evidence did not support the jury's verdict because there was insufficient evidence that the decedent was exposed to the *defendants'* products. Id., 529. The court disagreed. The court held that "[a]lthough no witnesses specifically testified that they saw the decedent handle the defendant's products, the jury reasonably could have found or inferred that he was exposed to the defendant's products based on the work that he was engaged in, the length of time he was employed, and the fact that coworkers who performed similar work testified that they handled the defendant's products." Id., 530. In reaching this decision, our Supreme Court tacitly determined that a defendant may be liable when its defective product contributes to a condition giving rise to an injury or death. That other sellers supplied similar products that also may have contributed to the decedents' asbestosis did not alter the Supreme Court's decision in any way.

In the present case, the plaintiffs submitted evidence implicating the defendants as the suppliers of petroleum products that leaked into the vault. Although the defendants' products may not have been the sole cause of the deoxygenation, there was evidence indicating that they significantly contributed to the dangerous condition. They did so by the proportion of oil that they supplied to Mitchell.

The defendants maintain that the decision in *Champagne* is distinguishable. They posit that the key difference lies in the fact that the plaintiff in *Champagne* proved with convincing clarity that the decedent had asbestosis, whereas, in the present case, "there is no firm connection between the offending product and the [asphyxiation]." This distinction, however, adds little to the analysis of product identification. Instead, it injects yet another challenge to the efficacy of the plaintiffs' expert theories, which we have already held raise

an issue of fact with respect to causation. The defendants' distinction simply has no bearing on the rule in *Champagne* that a product seller may be liable under Connecticut's product liability statute if its defective product contributes to the cause of an injury or death. In light of the decision in *Champagne* v. *Raybestos-Manhattan, Inc.,* supra, we conclude that a genuine issue of material fact exists as to the identification of the petroleum products that may have leaked into the vault.

## IV

### HYDROCARBON DISPLACEMENT

The plaintiffs next claim that the trial court improperly rejected the expert testimony of Eugene Brubaker, a toxicologist. Brubaker testified that "the cause of the death of the [decedents] was the displacement of oxygen in a confined space by hydrocarbon fumes . . . and that was due as a consequence of failure to warn about the hazards of confined spaces." Yet, according to environmental engineer George Hoag, the plaintiffs' other expert, Brubaker's theory is not viable. Hoag explained, "the three fuel oils were not volatile enough to support a vapor concentration that would displace oxygen." Ostensibly relying on this conflict between the plaintiffs' two expert witnesses, the court rejected hydrocarbon displacement as "physically impossible from the chemistry of the oil products here."

Our courts have repeatedly noted that it is the province of the trier of fact to resolve issues of credibility. " 'It is axiomatic that the determination of the credibility of expert witnesses and the weight to be accorded their testimony is within the province of the trier of facts, who is privileged to adopt whatever testimony he reasonably believes to be credible.' " *Voluntown* v. *Rytman,* 21 Conn. App. 275, 287, 573 A.2d 336, cert. denied, 215 Conn. 818, 576 A.2d 548 (1990), quoting

*Hartford Federal Savings & Loan Assn.* v. *Tucker,* 196 Conn. 172, 184, 491 A.2d 1084, cert. denied, 474 U.S. 920, 106 S. Ct. 250, 88 L. Ed. 2d 258 (1985). Equally well settled is that the trial court does not sit as the trier of fact when ruling on a motion for summary judgment. *Lomangino* v. *LaChance Farms, Inc.,* 17 Conn. App. 436, 438, 553 A.2d 197 (1989) (in granting summary judgment, court's function is not to decide issues of material fact).

In this case, the court flatly rejected the expert testimony of Brubaker. There is no indication that the trial court did so on the basis of the expert's qualifications or lack thereof. Instead, the court credited Hoag while discrediting Brubaker, a decision the court should have left to the trier of fact. It is certainly conceivable that the jury could disbelieve Hoag's testimony, including his disapproval of Brubaker's theory, and ultimately conclude that hydrocarbon displacement is a viable scientific theory to support a finding of causation. The bottom line is that, in granting summary judgment for the defendants, the trial court decided a genuine issue of material fact when it rejected testimony pertaining to the theory of hydrocarbon displacement.

The defendants argue that "[t]he trial court cannot be faulted for accepting the testimony of the plaintiffs' own expert." The flaw in the defendants' position is that it presupposes that the plaintiffs are not entitled to put forth alternative theories of liability. Our law, however, has never placed such a limitation on litigants. Cf. *Dreier* v. *Upjohn Co.,* 196 Conn. 242, 492 A.2d 164 (1985) (under our pleading practice, a plaintiff is permitted to advance alternative and even inconsistent theories of liability against one or more defendants in a single complaint); *DeVita* v. *Esposito,* 13 Conn. App. 101, 535 A.2d 364 (1987), cert. denied, 207 Conn. 807, 540 A.2d 375 (1988) (same). Instead, the search for the

truth demands that we submit separate scientific theories to the trier of fact, which may then assess matters of credibility and adopt one theory or the other, or neither.

## V

### ALTERNATIVE GROUNDS FOR AFFIRMANCE

The defendants argue that, even if we reject the court's bases for granting summary judgment, there are additional grounds on which the court's ultimate decision may stand. Specifically, the defendants argue that summary judgment was appropriate because (1) in light of federal regulations enacted after the incident at issue, there was no duty to warn about the dangers associated with the storage of petroleum products, (2) under the sophisticated user defense[16] the defendants[17] had no duty to warn, and (3) even if a duty to warn existed the defendants discharged that duty. Finally, the defendant oil suppliers assert that pursuant to General Statutes § 52-577c (b), the plaintiffs' claims are barred by the two year statute of limitations.

## A

### FEDERAL REGULATIONS

The defendants maintain that the trial court's decision should be upheld in light of federal regulations

---

[16] The defendant oil suppliers actually argued that the "sophisticated user/bulk supplier defense" was applicable. We, however, will refer to the asserted defense as the sophisticated user defense. We do so because other jurisdictions addressing these issues have analyzed the sophisticated user defense as separate and distinct from the bulk supplier defense. See, e.g., Little v. Liquid Air Corporation, 939 F.2d 1293, 1302 (5th Cir. 1991); Donahue v. Phillips Petroleum Co., 866 F.2d 1008 (8th Cir. 1989) (rejecting defendants' claim that bulk supplier and sophisticated user doctrines operate in tandem). The defendant oil suppliers' claim in essence relied on only the sophisticated user defense. They have not offered any analysis as to the applicability of the bulk supplier defense.

[17] The defendant oil suppliers invoked the sophisticated user doctrine against the defendant Wyatt, Inc., as a wholesale distributor of petroleum products, and against Mitchell Fuel. The defendant Wyatt, Inc., also invoked the doctrine, but relied on the sophistication of Mitchell Fuel as a retail distributor of petroleum products.

promulgated to limit the dangers associated with the manufacturing, distribution and use of hazardous chemicals. The defendants note that federal regulations passed by the Occupational Safety and Health Administration (OSHA) now require manufacturers of hazardous chemicals to issue "material safety data sheets" to distributors or employers whose employees use, distribute or produce hazardous chemicals. They argue that because these requirements were not in existence at the time of the incident at issue, warnings were not required at that time. This argument is without merit.

We initially note that the defendants' argument does not implicate the doctrine of preemption. "The question of preemption is one of federal law, arising under the supremacy clause of the United States constitution. U.S. Const., art. VI." *Serrano* v. *Serrano,* 213 Conn. 1, 5, 566 A.2d 413 (1989). "Preemption analysis has two prongs. In order to conclude that state regulatory action has been preempted, it must be determined that (1) Congress has evidenced an intent to occupy the field or (2) the state regulation actually conflicts with federal law. *Silkwood* v. *Kerr-McGee Corporation,* 464 U.S. 238, 248, 104 S. Ct. 615, 78 L. Ed. 2d 443 (1984); *Times Mirror Co.* v. *Division of Public Utility Control,* 192 Conn. 506, 510–11, 473 A.2d 768 (1984)." *Griffin Hospital* v. *Commission on Hospitals & Health Care,* 200 Conn. 489, 493–94, 512 A.2d 199, appeal dismissed, 479 U.S. 1023, 107 S. Ct. 781, 93 L. Ed. 2d 819 (1986).

At the time of the decedents' deaths, the federal regulations at issue had not been enacted. It follows that no conflict between Connecticut's product liability statute and the OSHA regulations could have possibly existed at the time of the accident. Therefore, we need not consider whether OSHA requirements preempt liability under § 52-572q. *Connecticut Television, Inc.* v. *Public Utilities Commission,* 159 Conn. 317, 337, 269

A.2d 276 (1970) ("[w]hether preemption has in fact occurred depends on whether the federal authority has, in fact, regulated the area").

The defendants also note that § 52-572q requires the issuance of adequate warnings "when required." They argue that since the OSHA regulations were not in existence at the time of the accident, warnings were not required. As the plaintiffs point out, however, this argument is wholly without merit because § 52-572q (b) lists three factors for consideration by the trier of fact "in determining whether instructions or warnings were required." By the express terms of the statute, liability for inadequate warnings is simply not dependent on the existence of requirements under federal law.

## B

### SOPHISTICATED USER DEFENSE

The defendants next assert that, applying the sophisticated user defense, they had no duty to warn under § 52-572q. In seeking the shelter of this defense, the defendant oil suppliers focus on their relationship with the defendant Wyatt, Inc., and Mitchell Fuel. Wyatt invokes the defense solely relying on its relationship with Mitchell Fuel.

We note at the outset that whether and to what extent the sophisticated user defense applies under § 52-572q is an issue of first impression. The sophisticated user defense originated in cases involving alleged *negligent* failure to warn. *Russo* v. *Abex Corporation*, 670 F. Sup. 206, 207 (E.D. Mich. 1987); Restatement (Second) Torts § 388 (1965); see, e.g., *Goodbar* v. *Whitehead Bros.*, 591 F. Sup. 552 (W.D. Va. 1984). Under this defense, "when the supplier has reason to believe that the purchaser of the product will recognize the dangers associated with the product, no warnings are mandated." *Goodbar* v. *Whitehead Bros.*, supra, 561. The

defense is compatible with the concept of negligence because it relates to the issue of reasonableness. Put another way, if a supplier is aware of its purchaser's knowledge and sophistication with respect to the product, the supplier reasonably may choose not to issue warnings.

The applicability of the sophisticated user doctrine is more controversial in the context of strict liability as is reflected by a split in the authorities from other jurisdictions. Those jurisdictions that have chosen not to import the doctrine to the law of strict liability hold that "a [product] seller is duty-bound to warn all foreseeable users and the risk of an employer's failure to warn employees is one of the risks imputed to the seller as a matter of law." *Russo* v. *Abex Corporation,* supra.

Other courts have noted that, in practical terms, there is no difference between strict liability and negligence with respect to the law of warnings. *Smith* v. *Walter C. Best, Inc.,* 927 F.2d 736, 741 (3d Cir. 1990) (applying Ohio law); *Higgins* v. *E.I. DuPont de Nemours, Inc.,* 671 F. Sup. 1055 (D. Md. 1987) (applying Maryland law). Accordingly, in these jurisdictions, the sophisticated user doctrine is a viable doctrine in actions for negligence and strict liability.

Federal courts interpreting the state of the law in Connecticut have rejected the applicability of the sophisticated user doctrine, reasoning that the doctrine is incompatible with Connecticut's recognition of strict liability. *Pedraza* v. *Shell Oil Co.,* 724 F. Sup. 1, 8 (D. Mass. 1989); *Hall* v. *Ashland Oil Co.,* 625 F. Sup. 1515, 1521 n.1 (D. Conn. 1986). These decisions have not, however, placed their analyses within the aegis of Connecticut's product liability statute.

Section 52-572q of our product liability statute expressly authorizes the trier of fact to consider the impact of a purchaser's sophistication and knowledge-

ability. In subsection (b), the statute directs the trier of fact to consider "the ability of the product seller to anticipate at the time of manufacture that the expected product user would be aware of the product risk and the nature of the potential harm."

In view of the statute's express language, we are satisfied that the provision has incorporated the concerns underlying the sophisticated user doctrine. It has *not* done so, however, to the extent that it offers product sellers an affirmative defense. Instead, the statute puts the issue of user awareness to the trier of fact along with other factors to be weighed in the aggregate. Thus, pursuant to § 52-572q (b), the anticipated awareness of an expected user with respect to the dangers of a particular product factors into the trier's determination of whether warnings were required and if so whether those provided were adequate. In relegating the issue of a user's anticipated awareness to a mere factor in the trier's determination of liability, our warnings statute minimizes the risk that product sellers and purchasers will simultaneously rely on one another to provide warnings with the result that none is issued to the ultimate product user.

In the present case, the defendant oil suppliers argue that, because Wyatt is a sophisticated purchaser, the trial court's granting of summary judgment is supportable on this alternative basis. The defendants may indeed be correct in their assertion that, through its experience with petroleum products, Wyatt was in a position to understand the dangers associated with petroleum storage. Nevertheless, even if we assume Wyatt's sophistication, the defendant oil suppliers' position is without merit because the statute speaks to the awareness of the *"expected product user,"* in this case Mitchell Fuel. General Statutes § 52-572q (b) (2). Thus because the defendant oil suppliers shipped their prod-

uct to Wyatt, a *wholesale distributor*, their argument must fail for purposes of summary judgment.

Furthermore, in cases involving knowledgeable wholesalers, it may be necessary for the manufacturer to issue warnings to the wholesaler who then can further distribute them to less sophisticated users. The trier of fact could even find that adequate warnings under § 52-572q requires that the manufacturer condition the initial product sale on the wholesaler's assurance that it would issue a particular set of warnings to subsequent purchasers. In short, Wyatt's knowledgeability is not, of itself, a basis on which this court can affirm, as a matter of law, the trial court's granting of summary judgment in favor of the oil suppliers.

The defendants, Wyatt and the oil suppliers, also assert that Mitchell Fuel is a sophisticated user. On this issue, however, the facts are in dispute. Moreover, even assuming Mitchell Fuel's knowledgeability, this fact alone would not warrant summary judgment. The trier still must weigh the anticipated awareness of the expected user against the remaining factors set forth in § 52-572q (b). In short, summary judgment cannot rest solely on the anticipated awareness of an expected product user. Rather, the trier of fact must consider the factors of subsection (b) in the aggregate to determine the need for or adequacy of warnings.[18] We conclude that the defendants' resort to the sophisticated user defense does not withstand analysis under § 52-572q.

## C

### DISCHARGING THE DUTY TO WARN

The defendants also argue that, even if they had a duty to warn, they discharged this duty. We again

[18] Of course, if the defendants were to put forth undisputed evidence that the users were fully aware of the dangers of deoxygenation and disregarded this knowledge, the lack of cause would in fact support the granting of summary judgment. We have already noted, however, that such is not the case here. See part III A, supra.

decline the defendants' invitation to make what would amount to a factual determination.

The defendants argue that the defendant Exxon Company, U.S.A., provided an adequate warning to Wyatt, which, in turn, forwarded it to Mitchell Fuel. The warning was in the form of a Material Safety Data Sheet. The data sheet warned that overexposure to "fumes of high vapor concentration" may cause "mild depression, convulsions and loss of consciousness." It also prescribed first aid procedures in the event that overexposure occurs. The data sheet further instructed that if "material" is released or spilled people should be kept away and enclosed spaces should be ventilated. Finally, the data sheet instructs "use with adequate ventilation." In a footnote, "adequate ventilation" is defined as "equivalent to outdoor ventilation."

Whether a warning is adequate is a decision for the trier of fact. General Statutes § 52-572q (b). " 'Warnings must specifically identify for the user the danger inherent in the products use.' " *Ames* v. *Sears, Roebuck & Co.*, supra, 646, quoting *Giglio* v. *Connecticut Light & Power Co.*, 180 Conn. 230, 235, 429 A.2d 486 (1980). When warnings are required, it is also necessary that they are adequately comprehensible. *Giglio* v. *Connecticut Light & Power Co.*, supra, 236.

In this case, we first note that there is some dispute as to whether Mitchell Fuel ever received the data sheet from Wyatt. Mitchell testified that he did not recall ever receiving such sheets from his suppliers prior to the enactment of OSHA regulations that required their issuance. All of the parties in this action agree that OSHA's material safety data sheet requirements were not in effect at the time of the accident. There is, thus, an issue of fact as to whether the data sheet ever reached Mitchell Fuel.

Moreover, assuming that the data sheet was in fact issued to Mitchell Fuel, the question of adequacy persists. While the data sheet makes reference to the need for ventilation, no mention is made of the risk of death or of the possibility of deoxygenation as described by the plaintiffs' experts. See *Little* v. *Liquid Air Corporation* 939 F.2d 1293, 1300 (5th Cir. 1991) (manufacturer or distributor fulfills duty to warn if it warns *all* dangers associated with its products of which it has actual or constructive knowledge); *Mason* v. *Texaco, Inc.*, 741 F. Sup. 1472, 1483–84 (D. Kan. 1990) (jury reasonably could conclude that reference in warning to "damage" was inadequate when risks included death).

Furthermore, the data sheet does not give the definition of "adequate ventilation" particular prominence, but instead refers to it in a footnote. The data sheet is also devoid of any instructions pertaining to the need to test oxygen levels inside underground storage facilities. We conclude therefore that whether warnings were in fact issued, and, if so, whether they were adequate are questions for the trier of fact.

## D

### STATUTE OF LIMITATIONS

The final issue in this appeal concerns the applicable statute of limitations. The oil suppliers posit that the three year limitation period applicable to product liability actions does not apply in this case. Rather, they assert that the two year provision of § 52-577c (b) applies and bars the claims of the plaintiffs and the third party plaintiff, Wyatt.[19] We disagree.

[19] General Statutes § 52-577a provides that a product seller may implead any third party if the third party is served within one year from the date the original action is returned to court. General Statutes § 52-577c, however, does not include a comparable provision. It is well settled that the legislature is presumed to act with knowledge of existing statutes and that

Products liability actions in Connecticut are subject to a three year limitation period. General Statutes § 52-577a. This period notwithstanding, General Statutes § 52-577c (b) provides, "no action to recover damages for personal injury or property damage *caused by exposure* to a hazardous chemical substance or mixture or hazardous pollutant released into the environment shall be brought but within two years from the date when the injury or damage complained of is discovered or in the exercise of reasonable care should have been discovered." (Emphasis added.) The oil suppliers claim that this latter provision bars, as a matter of law, Wyatt's and the plaintiffs' respective actions. *Daily* v. *New Britain Machine Co.*, 200 Conn. 562, 566–70, 512 A.2d 893 (1986) (summary judgment appropriate where action filed outside the limitation period).

Neither this court nor our Supreme Court has yet to discuss the relationship between the limitation of actions for product liability and that under § 52-577c (b).[20]

---

it intends to create one body of law. *Kinney* v. *State*, 213 Conn. 54, 65, 566 A.2d 670 (1989); *Housing Authority* v. *Olesen*, 31 Conn. App. 359, 365, 624 A.2d 920 (1993). When a provision is included in one statute and omitted in a related statute, courts presume that the omission was intentional. This is especially true where the statute without the provision creates an exception to the statute that includes the provision. *Caron* v. *Inland Wetlands & Watercourses Commission*, 222 Conn. 269, 277, 610 A.2d 584 (1992). Here, § 52-577c (b) provides, "notwithstanding the provisions of § 52-577a . . . ." Thus, *if* § 52-577c applies, the plaintiffs and the third party plaintiff will have failed to file their actions timely against the oil suppliers.

[20] The Federal District Court in the District of Connecticut, however, has had occasion to consider this particular issue. *West Haven School District* v. *Owens-Corning Fiberglass*, 721 F. Sup. 1547, 1552–54 (D. Conn. 1988). In *West Haven*, the plaintiff brought an action against asbestos manufacturers and distributors to recover public funds expended to abate health hazards allegedly stemming from the presence of asbestos in school buildings. The defendants filed a motion for summary judgment based on the two year limitation period set forth in § 52-577c.

The plaintiff in *West Haven* argued that § 52-577c should be narrowly construed and that under such a construction, the statute was inapposite. The plaintiff reasoned that the act applies only in cases involving the release of hazardous materials from industrial waste streams or toxic waste dumps

"The objective in analyzing legislative action is to discern and effectuate the apparent intent of the legislature. *State* v. *Blasko,* 202 Conn. 541, 553, 522 A.2d 753 (1987). In doing so, '[w]e look first to the plain, unambiguous language of the statute.' *Arway* v. *Bloom,* 29 Conn. App. 469, 473, 615 A.2d 1075 [cert. granted, 224 Conn. 924, 618 A.2d 530] (1992). Unless the statute is ambiguous, it is unnecessary and indeed improper to engage in an analysis of the history underlying the statute. *Klug* v. *Inland Wetlands Commission,* 30 Conn. App. 85, 90, 619 A.2d 8 (1993)." *Black* v. *London & Egazarian Associates, Inc.,* 30 Conn. App. 295, 300, 620 A.2d 176, cert. denied, 225 Conn. 916, 623 A.2d 1024 (1993).

In this case, the applicability of § 52-577c hinges on the statute's definition of "exposure." Exposure is defined in subsection (a) as "any contact, ingestion, inhalation or assimilation, including irradiation." For the provision to apply, an action must involve injury *"caused by exposure"* to a hazardous chemical substance or mixture or hazardous pollutant. The issue before us is whether the deaths of the decedents were caused by "exposure" to petroleum products.

Petroleum vapors were found to have entered the lungs of the decedents prior to their deaths. Uncontroverted medical reports and expert testimony indicate, however, that the decedents died from the lack of oxygen in the vault. The medical reports state that the decedents died from "asphyxiation by exclusion of oxygen."[21] In fact, the crux of the plaintiffs' cause of

into the ambient environment in a manner that affects groundwater and drinking water. Relying on the plain language of the statute and the statute's legislative history, the court agreed with the plaintiff's narrow construction of § 52-577c and denied the defendant's motion for summary judgment.

[21] With respect to the decedent Sharp, he was pronounced brain-dead two days after the accident, and shortly thereafter was removed from his

action is that the petroleum products deoxygenated the vault, not that the products released vapors such that the decedents died of contact, ingestion, inhalation or assimilation of them. Limiting the coverage of the statute to its express definition of exposure, we conclude that genuine issues of fact exist with respect to the applicability of the two year limitation period. As has proved true of many of the issues in this case, whether Wyatt and the plaintiffs timely filed their respective actions against the defendant oil suppliers remains a disputed factual issue for determination by the trier of fact.

The judgment is reversed and the case remanded for further proceedings consistent with this opinion.

In this opinion the other judges concurred.

---

life support system. It is the plaintiffs' contention that these three deaths each resulted from the same deoxygenated condition of the vault. The only difference in the case of the decedent Sharp is that his death was not immediate.