283 F.3d 110
 Kathleen DENSBERGER, Individually and as Executrix of the Estate of Colonel William Densberger, Mary Ann Kelly, Individually and as Executrix of the Estate of Colonel Robert Kelly, Lisa Rhodes Truluck, Individually and as Executrix of the Estate of Specialist Gary Rhodes, Jr., Deborah L. Robertson, Individually and as Executrix of the Estate of Major General Jarrett Robertson, Christopher Mancini, CW2, Wendy Mancini and Eric Johnson, Major, Plaintiffs-Appellees,
v.
UNITED TECHNOLOGIES CORPORATION, Defendant-Appellant,
Aeroquip Corporation, Alcoa Composites Inc. and Brunswick Corp., Defendants.
 Docket No. 00-9512.
 United States Court of Appeals, Second Circuit.
 Argued December 21, 2001.
 Decided March 12, 2002.
 
 COPYRIGHT MATERIAL OMITTED Andrew L. Frey, Mayer, Brown & Platt, N.Y., NY, (Catherine M. Sharkey, Mayer, Brown & Platt, and Mark A. Dombroff, Raymond L. Mariani, Dombroff & Gilmore, N.Y., NY, on the brief), for Defendant-Appellant.
 Steven R. Pounian (Francis G. Fleming, Brian J. Alexander, Jacqueline M. James, Raafat S. Toss, on the brief), Kreindler & Kreindler, N.Y., NY, for Plaintiffs-Appellees.
 William F. Sheehan, Frederick C. Schafrick, Ross E. Davies, Shea & Gardner, Washington, DC, for Amicus Curiae, The Aerospace Industries Association of America, Inc.
 Before MESKILL, KEARSE, and CALABRESI, Circuit Judges.
 CALABRESI, Circuit Judge:
 
 
 1
 Following a $22.9 million jury verdict, the district court entered judgment for the plaintiffs, and denied the defendant's post-trial motions for judgment as a matter of law and for a new trial. Defendant United Technology Corporation ("UTC") appeals. The principal questions presented on appeal are whether the Connecticut Products Liability Act ("CPLA") preempts plaintiffs' common law negligence theory of recovery, whether the Army's alleged knowledge of the relevant dangers defeats plaintiffs' allegations of failure to warn, and whether the government contractor defense applies to situations in which the contractor owes no duty to the ultimate end-users of the product. We affirm the district court.
 
 
 BACKGROUND
 
 
 2
 On February 23, 1993, a United States Army UH 60A Blackhawk helicopter returned to the Wiesbaden, Germany airfield following a flight. The helicopter was equipped with the External Stores Support System ("ESSS") kit, a removable system of horizontal supports affixed to the side of the helicopter from which two 230 gallon auxiliary external fuel tanks were suspended.[1]
 
 
 3
 As the helicopter approached the airfield's helipad, it began a shallow right turn to line up with the pad on the parking ramp. When the pilot attempted to level the helicopter out of the turn there was "no response" from the flight controls. The aircraft continued to turn steeply to the right. It completed an approximate 360 degree turn and crashed on its right side causing the right external tank to explode. Four Army officers died and two others — the pilot and an enlisted Army member — were severely injured.
 
 
 4
 The Blackhawk helicopter and the ESSS kit involved in this accident were manufactured for the U.S. Army by UTC. The Army was heavily involved in the development and testing of the Blackhawk, including testing of the ESSS-equipped version of the aircraft.
 
 
 5
 Post-accident investigation indicated that the helicopter involved in the crash may have had an unacceptable "asymmetric right lateral Center of Gravity (CG)"[2] at the time of the crash. This suspected lateral CG imbalance is thought to have resulted at least in part from the presence of unequal fuel loads in the right and left ESSS tanks. At the time of the crash, one auxiliary tank was nearly empty and the other was almost full. After the crash, additional flight tests were conducted. As a result of these tests, UTC developed a new "lateral center of gravity [flight] envelope," and recommended some special piloting procedures that were to be used when a helicopter operated outside of this "envelope." UTC also added a number of specific warnings to the operator's manual in relation to this new CG envelope.
 
 
 6
 The plaintiffs in this action — the pilot and passenger who survived the crash and the widows of the four deceased Army officers — sued UTC under the Connecticut Products Liability Act, CONN. GEN.STAT. §§ 52-572m-q, and asserted three distinct theories of liability: strict liability, negligence, and breach of implied warranty of merchantability. At the conclusion of an eleven day trial, the jury, answering interrogatories on a special verdict form, found UTC liable in negligence for failing to warn the Army that the helicopter could become uncontrollable during foreseeable flight conditions. The jury rejected all other grounds of liability, including those based on failure to warn under the strict liability and implied warranty theories. The jury also found that UTC had not made out the elements of its various affirmative defenses, one of which was the government contractor defense. The jury awarded plaintiffs $22.9 million in compensatory damages and no punitive damages.
 
 
 7
 After the district court entered judgment for the plaintiffs, UTC moved for judgment as a matter of law and, alternately, for a new trial. The district court denied UTC's motions on October 25, 2000. Densberger v. United Technologies Corp., 125 F.Supp.2d 585 (D.Conn.2000). On appeal, UTC argues, primarily, (1) that the jury found liability under a negligence-based post-sale duty to warn that is barred by the CPLA and, in any event, does not exist in Connecticut common law; (2) that, as a matter of law, UTC cannot be liable for failure to warn, as the Army knew of the relevant dangers; (3) that UTC is entitled to a new trial because plaintiffs' engineering expert testified as to the legal scope of UTC's duty to warn; and (4) that the government contractor defense protects UTC from liability.
 
 
 DISCUSSION
 
 
 8
 * UTC contends that the jury, by rejecting the plaintiffs' failure to warn claims under the strict liability and implied warranty theories, necessarily found that the warnings provided to the Army at the time of sale were adequate. In finding UTC liable for failure to warn under the negligence theory, therefore, the jury must have based its verdict solely on a violation of a duty to warn post-sale. This is so, because, according to the jury instructions, such a duty exists only in negligence and cannot be the basis for recovery either in strict liability or for breach of an implied warranty.[3]
 
 
 9
 UTC further asserts that — contrary to the jury instructions — there is, in fact, no negligence-based post-sale duty to warn in Connecticut common law. And, if there ever had been such a duty, it is now barred by the CPLA, which according to UTC includes no post-sale obligation and is the exclusive source of a manufacturer's duty to warn in Connecticut. On this basis, UTC requests judgment as a matter of law.
 
 
 10
 We reject UTC's argument, and in so doing affirm the district court's elegant analysis of the Connecticut common law and its relationship to the CPLA. First, it is clear, as the district court held, that the CPLA does not preempt all common law theories of product liability. Rather, as the exclusive basis for product liability claims under Connecticut law, the CPLA bars separate common law causes of action in product liability cases. See, e.g., Winslow v. Lewis-Shepard, Inc., 212 Conn. 462, 562 A.2d 517, 521 (1989) (holding that the CPLA bars a separate negligence-based cause of action). Common law theories, however, rather than being preempted by the CPLA, are incorporated into the statute unless they are expressly inconsistent with it. See, e.g., LaMontagne v. E.I. Du Pont de Nemours & Co., Inc., 41 F.3d 846, 855-56 (2d Cir.1994) (LaMontagne II) (holding that because the CPLA does not delineate the specific elements of the claims that it consolidates, the common law continues to provide the bases for, and theories of, recovery under the act, and that "the CPLA ... apparently was not meant to alter the substance of a plaintiff's rights or the facts that a plaintiff must prove in order to prevail"); Lamontagne v. E.I. Du Pont de Nemours and Co., Inc., 834 F.Supp. 576, 587-89 (D.Conn.1993) (Lamontagne I) (holding that the CPLA "certainly retains the plaintiff's right to allege the traditional theories of recovery along with the statutory basis for recovery under one unified count denominated as a `product liability claim'" (internal quotation marks omitted)), aff'd, 41 F.3d 846 (2d Cir.1994); Vitanza v. Upjohn Co., 257 Conn. 365, 778 A.2d 829, 839-41 (2001) (holding that the common law "learned intermediary" defense remains available under the CPLA); Potter v. Chi. Pneumatic Tool Co., 241 Conn. 199, 694 A.2d 1319, 1345 n. 34 (1997) (holding that the admissibility of state-of-the-art evidence in design defect claims remains available under the CPLA); Lynn v. Haybuster Mfg., Inc., 226 Conn. 282, 627 A.2d 1288, 1293 (1993) (holding that a common-law claim for loss of consortium can be brought as part of a CPLA action).
 
 
 11
 UTC's more plausible argument is that even if some common law theories remain available under the CPLA, those that expressly conflict with the statute do not. The language of the CPLA, UTC contends, explicitly rules out any post-sale duty to warn. It is true that the text of the CPLA contains a discussion of duty to warn, which talks about that duty only at the time of manufacture. See § 52-572q(b) ("In determining whether instructions or warnings were required and, if required, whether they were adequate, the trier of fact may consider ... the ability of the product seller to anticipate at the time of manufacture that the expected product user would be aware of the product risk...."). UTC argues that this express discussion necessarily precludes liability based on the absence of post-sale warnings, regardless of the theory of liability.[4]
 
 
 12
 Again, we disagree. As the Connecticut Supreme Court has recently held in relation to CPLA preemption of the common law, "`[i]nterpreting a statute to impair an existing interest ... is appropriate only if the language of the legislature plainly and unambiguously reflects such an intent.'" Vitanza, 778 A.2d at 840 (quoting Ahern v. New Haven, 190 Conn. 77, 459 A.2d 118, 121 (1983)) (emphasis added) (holding that because the learned intermediary defense is not explicitly abrogated by the CPLA, it remains available under the statute). Because the CPLA does not expressly prohibit post-sale liability for negligent failure to warn, the negligence-based common law duty survives and is cognizable under the statute.
 
 
 13
 Significantly, the CPLA discusses the duty to warn in terms of product defect, that is, in terms of strict liability and liability for violation of implied warranties. See § 52-572q(a) ("A product seller may be subject to liability for harm caused to a claimant who proves by a fair preponderance of the evidence that the product was defective in that adequate warnings or instructions were not provided." (emphasis added)). The statute may therefore perhaps be read to establish standards for determining whether a product is defective due to a defendant's failure to warn; it does not, however, establish any standards for determining when and whether a defendant may be negligent in failing to warn. For these standards, we must look to the common law. "[A]lthough the [CPLA] addresses some substantive aspects of a product seller's duty to warn, it does not address all of the applicable elements necessary for recovery under that theory. Those elements must be derived from Connecticut common law." Lamontagne I, 834 F.Supp. at 588 (footnote omitted) (looking to Connecticut common law to determine whether there is a duty to warn in situations where the defendant neither knows, nor has reason to know, that the product is dangerous).
 
 
 14
 Also, notably, very shortly before the CPLA was passed in 1979, the Connecticut Supreme Court restated the Connecticut rule that while duty to warn for strict product liability is attributed only at the time of sale, duty to avoid negligence in failure to warn persists in post-sale situations. See Prokolkin v. Gen'l Motors Corp., 170 Conn. 289, 365 A.2d 1180, 1185-1186 (1976); see also Handler v. Remington Arms Co., 144 Conn. 316, 130 A.2d 793, 795 (1957) (finding post-sale duty to warn in negligence). Under the circumstances, we certainly cannot say that the CPLA's discussion of failure to warn "plainly and unambiguously" overturns what the Connecticut court had so recently reaffirmed to be Connecticut law on this issue.
 
 
 15
 It follows that the post-sale duty to warn exists in negligence, and is cognizable under the CPLA. Therefore, to the extent the jury found UTC liable because of a breach of a post-sale duty to warn under negligence, the verdict is consistent with Connecticut law.
 
 II.
 
 16
 UTC also contends that the Army's superior knowledge of the relevant dangers is "uncontroverted" in the record, and therefore that UTC is entitled to judgment as a matter of law because (1) there can be no breach of a duty to warn if the purchaser already knew of the dangers at issue, and (2), even if there were a breach, there can be no causation if the Army already knew of the dangers, and yet failed to warn its pilots or take other actions to avoid the danger. Alternately, UTC contends that Judge Hall erred by failing to advise the jury that UTC was not liable under the negligence theory for failing to warn the Army of dangers of which the Army was already aware.
 
 
 17
 We will reverse the denial of a Rule 50(b) motion "only if the evidence, drawing all inferences in favor of the non-moving party and giving deference to all credibility determinations of the jury, is insufficient to permit a reasonable juror to find in her favor." Lavin-McEleney v. Marist Coll., 239 F.3d 476, 479 (2d Cir.2001). We agree with the district court that a reasonable jury could conclude from the evidence at trial in this case (a) that UTC knew or should have known that the helicopter could become uncontrollable in an asymmetric condition when equipped with the ESSS auxiliary tanks, and (b) that the Army did not have similar knowledge. UTC is therefore not entitled to judgment as a matter of law on this ground. We further hold that the district court properly permitted the jury to decide all the other issues of causation raised by UTC.
 
 
 18
 The jury instruction issue is somewhat more complex. It is true that the court's charge on negligence[5] did not instruct the jury that—in the absence of unusual circumstances[6]—a prudent person need not inform people of those dangers that are generally known.[7] It is also true that the court's instruction on causation[8] did not specify that where the defendant's negligence consists in a failure to warn, a jury must find no cause, and therefore no liability, if the person who should have been warned would have acted in the same way had the warning in fact been given. Such charges would, doubtless, have been useful supplements to the instructions given. But, in the circumstances of this case, their absence does not warrant a new trial.
 
 
 19
 First, the instructions given were not erroneous; they were at most incomplete. And we will not upset a judgment on the basis of jury instructions "if the charge actually given was correct and sufficiently covered the essential issues," as this charge did. BAII Banking Corp. v. UPG, Inc., 985 F.2d 685, 696 (2d Cir.1993) (citing Carvel Corp. v. Diversified Management Group, Inc., 930 F.2d 228, 231 (2d Cir.1991)). Second, UTC did not expressly assert below that the instructions were wrong; rather it proposed alternate charges. But in order to succeed when challenging jury instructions in this way, the appellant must show that the requested charge "accurately represented the law in every respect." United States v. Feliciano, 223 F.3d 102, 116 (2d Cir.2000) (quoting United States v. Thompson, 76 F.3d 442, 454 (2d Cir.1996)). Since UTC's proposed jury instructions on the issue of the Army's knowledge contained errors of law, the district court did not err in refusing them.[9]
 
 
 20
 Because the jury instructions on causation and negligence in this case were neither properly objected to nor plainly incorrect, no new trial is required.
 
 III.
 
 21
 Plaintiff's expert Mel Vague, a retired helicopter engineer, offered the following testimony:
 
 
 22
 Q: Do you have an opinion, sir, as to whether or not, if a customer has some information about the use of its product, whether that relieves a reasonably careful manufacturer of taking steps to make sure that the aircraft is used safely?
 
 
 23
 ....
 
 
 24
 A: I believe that the manufacturer has an obligation to look out for their product, no matter whether the user has information or not.
 
 
 25
 Between the above-stated question and answer, defense counsel objected that the question called for a legal opinion. The objection was overruled.[10]
 
 
 26
 "It is a well-established rule in this Circuit that experts are not permitted to present testimony in the form of legal conclusions." United States v. Articles of Banned Hazardous Substances Consisting of an Undetermined Number of Cans of Rainbow Foam Paint, 34 F.3d 91, 96 (2d Cir.1994). But even the wrongful admission of expert testimony containing legal opinion does not necessarily require reversal. See United States v. Bilzerian, 926 F.2d 1285, 1295 (2d Cir.1991) (no reversible error in admitting expert testimony explaining federal securities regulation and filing requirements where a limiting instruction was given to the effect that the judge alone would instruct the jury on the law). In the instant case, the trial judge properly advised the jury to follow the law, rather than the testimony of any witness: "You must take the law as 1 give it to you. If any attorney or any witness or any exhibit has stated a legal principle different from one that I state to you in these instructions, it is my instructions that you must follow." Under the circumstances, whether or not Vague's statement could be construed as presenting a legal conclusion, we find that the admission of the testimony was harmless.
 
 
 27
 Vague's testimony does not justify overturning the jury's conclusions.
 
 IV.
 
 28
 Finally, UTC argues that it is entitled to judgment as a matter of law or to a new trial based on the so-called government contractor defense. UTC contends (1) that no reasonable juror could have found that UTC failed to meet its burden in proving this defense, and (2) that the district court erred in its jury charge on this issue. We do not need to reach these questions, however, because we conclude that the government contractor defense is irrelevant to this case, and, as a result, should not have been sent to the jury at all.
 
 
 29
 In Boyle v. United Technologies Corp., 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988), the Supreme Court extended the immunity afforded to the federal government's discretionary functions under the Federal Tort Claims Act to government contractors, by allowing those contractors an affirmative defense to state law tort actions if a "significant conflict" exists between the requirements of state law and the contractor's obligations to the federal government. 487 U.S. at 512, 108 S.Ct. 2510. The affirmative defense applies only if the government exercised significant control over the relevant contractor actions. In failure to warn cases, this means that the ultimate product users cannot sue the contractor for failure to warn if the government controlled which warnings the contractor was allowed to provide to those users, and thereby precluded the warnings at issue from being given. See In re Joint Eastern and Southern District New York Asbestos Litigation (Grispo v. Eagle-Picher Industries, Inc.), 897 F.2d 626, 630, 632 (2d Cir.1990).[11]
 
 
 30
 All parties to the present action, however, have agreed that UTC had no duty whatsoever to warn the ultimate product users, i.e., the pilots.[12] The failure-to-warn claim in this case is brought strictly with respect to UTC's duty to warn the Army. But, as stated above, the government contractor defense applies only when the government, for reasons of federal interest, chooses to limit the warnings provided by the seller to end-users. It does not apply to limit the warnings that a reasonable seller would provide to the government itself. UTC's arguments regarding the government contractor defense are therefore meritless, and the defense should not have been sent to the jury in the first instance.
 
 V.
 
 31
 Since we find that UTC's rule 50(b) motion was properly be denied, and since we find no reversible error in how the case was sent to the jury, we AFFIRM the judgment of the district court.
 
 
 
 Notes:
 
 
 [1]
 The ESSS-kit was originally designed to provide substantially more fuel capacity for self-deployment (i.e., allowing the carriage of sufficient fuel for the Blackhawk to fly across the Atlantic Ocean) and for launching "Hell-fire" missiles
 
 
 [2]
 "Lateral CG" refers to the side-to-side balance of the helicopter. The "flight envelope," or safe operating boundaries, for the aircraft is depicted in a "lateral CG chart," which consists of a curve plotted along two axes — the gross weight of the aircraft in pounds (vertical) and the lateral CG in inches (horizontal)
 
 
 [3]
 The strict liability and breach of implied warranty jury charges both referred explicitly to the product at "the time of sale." The negligence jury charge, in contrast, stated that "[a] manufacturer has a duty to exercise reasonable care in the design, manufacture and sale of its products. Reasonable care is that degree of care which a reasonably prudent manufacturer would use under like circumstances. Further,a manufacturer has a continuing duty to warn of all known or knowable dangers associated with using its product." (emphasis added)
 
 
 [4]
 In support, UTC citesSharp v. Wyatt Inc., 31 Conn.App. 824, 627 A.2d 1347, 1355 (1993), aff'd, 230 Conn. 12, 644 A.2d 871 (1994), a failure to warn case holding that the negligence theory of foreseeability cannot be imported into the CPLA, because it is inconsistent with the definition of causation as stated in § 52-572q(c). UTC also cites Gajewski v. Pavelo, 36 Conn.App. 106, 652 A.2d 509, 514 (1994), aff'd 236 Conn. 27, 670 A.2d 318 (1996), in which the Connecticut intermediate appellate court stated, in dicta, that if the jury had been instructed to use a common law negligence standard to determine whether the duty to warn had been violated, "there would be a reversible error."
 
 
 [5]
 The negligence charge stated in relevant part:
 Negligence is the failure to use reasonable care. A manufacturer has a duty to exercise reasonable care in the design, manufacture and sale of its products. Reasonable care is that degree of care which a reasonably prudent manufacturer would use under like circumstances.... Negligence may consist either in doing something that a reasonably careful person would not do under like circumstances, or in failing to do something that a reasonably careful person would do under like circumstances.
 You must determine the question by placing an ordinarily prudent person in the situation of UTC and then ask yourselves, what would such a person have done? ... "Reasonable care" is the care which such a person would have used under the surrounding circumstances, in view of the facts he or it knew or, as such a person should have perceived and known.
 The standard of care required, that of an ordinarily prudent person under the circumstances, never varies; but the degree of care may vary with the circumstances. All of the surrounding circumstances must be considered. In circumstances of slight danger a slight amount of care might be sufficient to constitute reasonable care, while in circumstances of great danger a correspondingly great amount of care would be required to constitute reasonable care.
 
 
 [6]
 These might, for example, include extraordinarily great danger, knowledge of a proximate category of users who are ignorant, continuing duty because of special relationship, etc
 
 
 [7]
 But cf. Liriano v. Hobart Corp., 170 F.3d 264, 270 (2d Cir.1999) (holding that, even if a danger is obvious, there may still be a duty to warn of the existence of a safer alternative that is not generally known).
 
 
 [8]
 The charge on causation was as follows:
 In each of their three theories asserted under the Connecticut Products Liability Act, the plaintiffs must prove that UTC's action or inaction was the proximate cause of the injuries they suffered. "Proximate cause" simply means substantial factor. Product defect or negligence or breach of the implied warranty of merchantability is a proximate cause of any injury when it is a substantial factor in producing that injury. To be a substantial factor in producing the injury, product defect, negligence or breach of the implied warranty of merchantability must have entered into the production of the injury, as a cause of it. That is, in order to find the defendant liable, you must find that UTC's act or omission must either have caused the injury itself, alone, or it must have materially contributed to it in conjunction with other factors. This does not mean that the law recognizes only one proximate cause of an injury or damage, consisting of only one factor. On the contrary, many factors may operate at the same time, either independently or together, to cause injury or damage and, in such a case, each may be a proximate cause.
 
 
 [9]
 UTC proposed the following jury instructions, the first before the court charged the jury, the second in answer to the court's charge. Each contained incorrect statements of law:
 1) Remember, for plaintiffs to prove their claims, they must establish by a preponderance of the evidence that if adequate warnings or instructions had been provided, the plaintiffs would not have suffered the harm. In other words, if you find, for example, that even if UTC provided the Army with adequate warnings, the Army would not have provided those warnings to the pilots of this helicopter, then you must find for the defendant UTC on the failure to warn claim.
 "Defendant UTC's First Amended Proposed Jury Instructions," dated January 20, 2000.
 2) A defendant cannot be held liable for a failure to warn about information already known to the product purchaser. If the Army knew information that plaintiffs allege should have been provided as a warning by UTC, even if UTC had a duty to warn the Army, it cannot be held liable for failing to warn of facts already known to the Army. UTC asserts that it had no duty to warn the Army about the hazards or dangers associated with use of the ESSS kit for purposes other than self-deployment and Hellfire missile demonstration because the Army and the United States Congress were well aware of those hazards and dangers, as exemplified by the Congressional report, Tailby memorandum and other documents and testimony.
 "Additional Objections to Jury Instructions by Defendant UTC," dated June 8, 2000.
 UTC's first proposed charge is incorrect because, after stating what might well be a correct instruction, it goes on to say that UTC would only be liable if, had it warned the Army, the Army would have warned the pilots. But in fact UTC would also be liable if, had UTC warned the Army, the Army would have taken any number of other available measures to avoid the accident, e.g., prevented the helicopters from being used in the manner that the warning revealed to be dangerous, or, without warning the pilots of certain dangers linked to the helicopter, instructed them on how to deal with certain eventualities were they to occur.
 The second proposed instruction is no less flawed. It is wrong if one reads it as seeking to object to the charge with respect to the question of whether the defendant acted unreasonably in not warning. A defendant, for example, might well be unreasonable in failing to warn about information already known to the purchaser if the defendant was unaware that the purchaser had the information. The instruction is also wrong with respect to the causation issue, because it is possible that if the Army had been warned of the danger of which it already knew, it might have warned the pilots, and would have done so even if, absent a warning, it had failed to caution them. Thus, UTC's warning might have led the army to say, "Gee, if this danger (of which we're already aware) is important enough so that UTC decided to warn us of it, we'd better let the pilots know about it too." UTC's proposed charge ignores this, as well as other, similar, possibilities.
 
 
 [10]
 UTC also cites Vague's statement that a customer should not have to tell the manufacturer what type of testing would be prudent, because "[i]f the manufacturer is prudent, he would suggest that those tests be run, but, you know, in a forceful manner." This statement was not objected to, however, and any objections to it were therefore forfeitedSee In re Air Disaster at Lockerbie Scotland on Dec. 21, 1988, 37 F.3d 804, 827 (2d Cir.1994); Fed.R.Evid. 103(a)(1).
 
 
 [11]
 The three requirements of theBoyle test for failure-to-warn cases are: (1) "government control over the nature of product warnings"; (2) "compliance with the Government's directions"; and (3) "communication to the Government of all product dangers known to it but not to the Government." Grispo, 897 F.2d at 630 n. 4.
 
 
 [12]
 This is because all parties agreed that, under the Connecticut learned intermediary doctrine, no such duty exists. Since the parties agree on this point, we need not consider whether they correctly interpret this Connecticut rule