Ira SANDERS, M.D. and Christopher
M. Shaari, M.D., Plaintiffs,

v.

The MOUNT SINAI SCHOOL OF MED-
ICINE, The Mount Sinai Hospital and
The Mount Sinai Medical Center, De-
fendants.

No. 03Civ.7937(JGK)(KNF).

United States District Court,
S.D. New York.

Sept. 13, 2005.

David N. Mair, P.C., Kaiser, Saurborn &
Mair, P.C., New York City, for Plaintiffs.

Bettina B. Plevan, Lloyd B. Chinn, Pros-
kauer Rose LLP, New York City, for De-
fendants.

## MEMORANDUM and ORDER

FOX, United States Magistrate Judge.

### I. INTRODUCTION

Plaintiffs Ira Sanders, M.D., and Chris-
topher M. Shaari, M.D., allege, *inter alia,*
breach of contract against The Mount Si-
nai School of Medicine, The Mount Sinai
Hospital and The Mount Sinai Medical
Center ("Mount Sinai" or "defendants").[1]
Before the Court is the defendants' motion
to strike the expert report of Maurice B.
Stiefel ("Stiefel"), an attorney employed at
the law firm Bryan Cave LLP. The plain-
tiffs oppose the motion. It is addressed
below.

### II. BACKGROUND

In 1998, Drs. Sanders and Shaari were
awarded a patent (the "Botulinum Use
Patent") for their development of a method
for treating the symptoms of eight medical
conditions, including hyperhydrosis (exces-
sive sweating) and rhinorrhea (runny-nose
and post-nasal drip), using the neurotoxin,
botulinum toxin (the "Invention").[2] Previ-
ously, pursuant to an institutional policy
governing the development and patenting

1. According to the defendants, Mount Sinai
School of Medicine is incorrectly named in
the complaint as "The Mount Sinai School of
Medicine."

2. At all relevant times, Dr. Sanders was em-
ployed at Mount Sinai. Dr. Shaari was em-
ployed at Mount Sinai from 1991 until 1996.

of scientific inventions by its faculty, Mount Sinai had elected to exercise its option to accept an assignment by the plaintiffs of their rights in the Invention. Accordingly, on April 13, 1994, Drs. Sanders and Shaari assigned their right, title and interest in the Invention to Mount Sinai, together with all patent rights thereto, and agreed to cooperate with Mount Sinai in submitting a patent application to the United States Patent and Trademark Office ("PTO"). According to the plaintiffs, pursuant to the Mount Sinai Faculty Handbook that governed the terms of employment of faculty during the period 1989 through 1996, in return for their assignment of their rights in the Invention, Mount Sinai agreed to pay them a specified percentage of any net revenues derived from its development. Furthermore, plaintiffs contend, under New York law, the defendants had an implied obligation to use reasonable efforts to commercialize the Invention so as to generate such revenues.

On March 29, 2001, the PTO declared Interference No. 104,688, between the Botulinum Use Patent assigned to Mount Sinai by the plaintiffs and a patent that had been filed by "Aoki et al." and assigned to the Allergan Pharmaceutical Corporation ("Allergan"). During the interference proceeding that followed, the PTO sought to determine which party had priority to the patented uses of the botulinum toxin in the treatment of hyperhydrosis and rhinorrhea. The priority of the uses of the botulinum toxin for other medical conditions covered by the Botulinum Use Patent was not challenged by Allergan and, therefore, was not considered in the interference proceeding.

On July 1, 2001, Mount Sinai entered into a licensing agreement with Allergan, pursuant to which Mount Sinai licensed to Allergan its rights under the Botulinum Use Patent to use botulinum toxin for the treatment of hyperhydrosis. Allergan subsequently developed and commercialized the botulinum toxin under the product name, "Botox."

On November 9, 2001, Mount Sinai and Allergan presented to the PTO, *inter alia,* provisional concessions of priority with respect to the treatment of hyperhydrosis and rhinorrhea, respectively. Thereafter, on February 26, 2002, the PTO issued a decision that, among other things, accepted Mount Sinai's concession of priority with respect to the treatment of hyperhydrosis and, as a consequence, struck seven claims from the Botulinum Use Patent. The plaintiffs contend that this aspect of the PTO's decision constituted the loss of substantial patent coverage by Mount Sinai. The plaintiffs contend further that Mount Sinai's failure to police and enforce the rights contained in the Botulinum Use Patent, so as to avoid such a loss of patent coverage, constituted a breach of its implied obligation, as set forth in the parties' patent assignment agreement, to use reasonable efforts to commercialize the patent.

Stiefel's expert report speaks to these claims. In Stiefel's view, Mount Sinai's failure to adopt any of three possible courses of action by which it might have avoided the loss of substantial patent coverage constituted a "failure to exercise reasonable steps to maintain all, or as much as possible, of the original patented subject matter" contained in the Botulinum Use Patent. Thus, according to Stiefel, before settling the interference proceeding, Mount Sinai should have sought a "reissue" of the Botulinum Use Patent such that claims which were likely to be stricken by the PTO would be retained in modified form. In addition, or alternatively, in Stiefel's view, Mount Sinai should have investigated evidence of early invention activity by Drs. Sanders and Shaari,

which would have allowed Mount Sinai to contest priority with respect to the treatment of hyperhydrosis and thus maintain its entire patent coverage intact. Finally, according to Stiefel, Mount Sinai should have investigated evidence that Drs. Sanders and Shaari may have been the first to conceive the Invention and "commence diligence," that is, before "Aoki et al." entered the field, again, in an effort to preserve the "essential breadth of the patent coverage."

Mount Sinai contends that Stiefel's report is improper because it invades the province of the court by offering legal conclusions concerning the scope of the claims in the Botulinum Use Patent. The defendants also contend that Stiefel's report questions improperly decisions made by Mount Sinai, which, as the owner of the Botulinum Use Patent, has exclusive control over its use and disposal. Mount Sinai, therefore, seeks an order striking Stiefel's report or, in the alternative, a reasonable amount of time in which to submit a rebuttal.

For their part, the plaintiffs argue that the opinions expressed by Stiefel in his report relate to the reasonableness of certain courses of action open to Mount Sinai at the time of the PTO's interference proceeding and, thus, are not legal conclusions concerning patent protection. According to the plaintiffs, Stiefel's discussion of the legal options available to Mount Sinai "forms the premise for his opinions, in the same manner as an expert assumes and discusses certain factual predicates upon which an opinion is premised." Moreover, plaintiffs argue, although they assigned their rights in the Botulinum Use Patent to the defendants, nevertheless they are entitled to challenge the reasonableness of the defendants' actions where, as the plaintiffs allege, the defendants have "forfeited significant patent protection."

### III. DISCUSSION

Fed.R.Evid. 702 provides the following:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the Supreme Court explained that a federal trial court has a gatekeeping responsibility when opinion evidence is sought to be presented to a jury. The court must ensure that the testimony to be presented to the jury is based upon methods and procedures that are reliable, that is, "more than subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590, 113 S.Ct. at 2795.

"Experts may testify on questions of fact as well as mixed questions of fact and law." *Fiataruolo v. United States*, 8 F.3d 930, 941 (2d Cir.1993). However, "[i]t is a well-established rule in this Circuit that experts are not permitted to present testimony in the form of legal conclusions." *Densberger v. United Technologies Corp.*, 297 F.3d 66, 74 (2d Cir.2002) (quoting *United States v. Articles of Banned Hazardous Substances*, 34 F.3d 91, 96 [2d Cir.1994] ); *see also Hygh v. Jacobs*, 961 F.2d 359, 363 (2d Cir. 1992)("This circuit is in accord with other circuits in requiring exclusion of expert testimony that expresses a legal conclusion.")(citing cases). Testimony in the form of legal conclusions is improper because it "usurp[s] the roles of judge and

jury." *United States v. Russo,* 74 F.3d 1383, 1395 (2d Cir.1996). Furthermore, "the Supreme Court has repeatedly held that the construction of a patent claim is a matter of law exclusively for the court." *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 977.(Fed.Cir.1995).

 The Court has reviewed the parties' written submissions and has determined that the expert report prepared by Stiefel is admissible. In his report, Stiefel describes each of the eighteen claims included in the original Botulinum Use Patent and identifies the elements of the patent claims that were lost as a result of the 2002 judgment of the PTO. For example, with respect to claim 1 of the Botulinum Use Patent, Stiefel explains that "one of the disease symptoms referred to for treatment is COPD (Chronic Obstructive Pulmonary Disease), e.g., emphysema and chronic bronchitis. Because Mt. Sinai lost claim 1 in the Interference, it lost all patent coverage for treatment of that particular disease."

Defendants argue that this and similar passages construe or interpret the claims of the Botulinum Use Patent in a way that involves claim construction, which is a question of law for the court. However, it appears that the purpose of these passages is not to engage in claim construction, but, rather, to lay a foundation for the opinion, expressed by Stiefel, that Mount Sinai failed to take reasonable measures to commercialize the Botulinum Use Patent. As noted above, Stiefel proposes three ways in which Mount Sinai might have taken reasonable steps to avoid a loss of patent coverage at the time of the interference proceeding. In the absence of a discussion of the content of the claims contained in the original patent, Stiefel's proposal in this regard would lack both context and factual support. Therefore, when examined in the proper light, Stiefel's discussion of the claims included in the Botulinum Use Patent is "not a simple bald assertion of the law and [is] not designed to invade the province of the trial court." *Fiataruolo,* 8 F.3d at 942.

Defendants argue that Stiefel's report questions improperly decisions made by Mount Sinai concerning the use and disposal of the Botulinum Use Patent. As noted above, the plaintiffs allege that Mount Sinai's failure to avoid the loss of patent coverage constituted a breach of its implied obligation, as set forth in the parties' patent assignment agreement, to use reasonable efforts to commercialize the patent. Stiefel's report assumes that such an implied obligation exists. Under the circumstances, given that the plaintiffs were permitted to amend the complaint to add this claim and that a decision on the merits of the complaint has not been reached, Stiefel's decision to proceed on such an assumption was not inappropriate.

The defendants have requested, in the event that Stiefel's report is determined to be admissible, an order permitting them a reasonable amount of time in which to submit a rebuttal. However, as the plaintiffs point out, the defendants have already offered the expert report of Ashley J. Stevens, the Director of the Office of Technology Transfer at Boston University, which addresses the issues raised in Stiefel's report directly. Consequently, there does not appear to be any need for an additional expert report on this subject.

## IV. CONCLUSION

For the reasons set forth above, the defendants' motion to strike Stiefel's expert report is denied.

SO ORDERED.